

# Fourth Court of Appeals
## San Antonio, Texas

## MEMORANDUM OPINION

No. 04-23-01023-CV

**IN THE INTEREST OF I.J.S.** and B.K.S.

From the 438th Judicial District Court, Bexar County, Texas
Trial Court No. 2022-PA-00603
Honorable Raul Perales, Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:        Patricia O. Alvarez, Justice
                Liza A. Rodriguez, Justice
                Lori I. Valenzuela, Justice

Delivered and Filed: June 20, 2024

AFFIRMED

Mother and Father[1] appeal the trial court's termination of their parental rights. Mother's parental rights were terminated pursuant to section 161.001(b)(1)(D), (E), (N), and (O) of the Texas Family Code. Father's parental rights were terminated pursuant to subsections (E) and (O). On appeal, Father argues the evidence is legally and factually insufficient to support termination pursuant to subsections (E) and (O). Both Mother and Father argue the evidence is legally and factually insufficient to support the trial court's findings that termination of their parental rights was in the best interest of their children. We affirm.

---

[1]To protect the identity of the minor child, we refer to the parties by fictitious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

## BACKGROUND

In 2022, Mother was a fifth-grade elementary school teacher. Father was employed by the United States Navy as a language analyst. They had been married for about thirteen years. They had two children: I.J.S., a twelve-year-old daughter; and B.K.S., a nine-year-old son.

On April 18, 2022, the Department filed the underlying suit seeking termination of Mother's and Father's parental rights. Bianca Martinez, an investigation supervisor with the Department, testified that the investigation began due to allegations of twelve-year-old I.J.S. having an inappropriate sexual relationship with another child, which included exchanging explicit photos with one another. Martinez testified there were allegations Mother had encouraged I.J.S. and a boy to engage in different sexual acts and had snuck the boy into her home so that I.J.S. could have sexual relations with him.

Martinez interviewed Mother who said that the boy "had requested topless photos of [I.J.S.] and that [I.J.S.] had . . . asked her about it." Mother said that she told I.J.S. to do "whatever she wanted to do" and did not "discourage her in any way." According to Martinez, Mother "admit[ted] to sending messages to [the boy]" and "to encouraging the underage boy . . . through messages to touch [I.J.S.]'s vagina." When asked why she sent messages to the underage boy, Mother replied that she did so "because that's what [I.J.S.] wanted him to do."

Martinez testified that Father "would not allow a forensic interview of the children" and "did not wish to discuss the allegations against" Mother. According to Martinez, that is when "his protective capacity came into question," and the Department removed the children from the care of both parents.

Martinez was able to interview I.J.S. later. According to Martinez, I.J.S. told her that Mother "was present when [she] and the underage boy were on [a] hill and he was fondling her breasts under her shirt." I.J.S. said Mother "was aware that the underage boy was trying to have

sex with her, wanted to have sex with her, and she didn't want to." I.J.S. said that Mother "told her to do . . . what he wanted because he would get mad." I.J.S. also said that Mother "encouraged her to perform a hand job on the underage boy" even though she did not want to. Mother told her to "just do it" because "that's what he wants." Mother also purchased I.J.S. and the boy "flavored condoms."

At the time of trial, Mother was incarcerated at a federal detention center awaiting trial in her federal criminal case. Mother was charged with attempted production of child pornography, attempted coercion and enticement of a child, and obstruction of justice. At the parental termination trial, a transcript of a federal pretrial hearing in Mother's federal criminal case was admitted in evidence.

At that September 30, 2022 federal hearing, the federal prosecutor read a proffer from Special Agent Gerald Martin with the Naval Criminal Investigative Service into the record. The proffer detailed the following criminal allegations against Mother. On April 1, 2022, the case began when a woman approached Joint Base San Antonio Lackland Security Forces and reported that Mother, who was a Lackland resident, had been sending sexually explicit text messages to her thirteen-year-old son. The woman had found a phone in her son's possession, which had Mother saved as a contact called "Mom." On the phone were sexually explicit discussions between Mother and the thirteen-year-old boy. For example, Mother told the boy that I.J.S. had never seen a penis, told the boy to send I.J.S. pictures of his penis, and then gave him money for doing so. In another text, Mother directed the boy to masturbate. Also on the boy's phone was evidence that Mother had been sending money and expensive gifts to the boy, including a Visa card, an Xbox game, and an Xbox controller. The boy spoke with base authorities and reported that Mother had also given him three or four iPads and iPhones to communicate and had told him not to tell his parents about the devices. The boy took three to four pictures of his penis and sent them to I.J.S., and I.J.S. sent

him back four pictures of her breasts. The boy said that the first time Mother made this request, she said she would pay him in cash. The second time, she said she would buy him anything at GameStop. The third time, she said she would give him $20. The boy said that Mother frequently took him to her home and encouraged him to engage in sexual relations with I.J.S. Text conversations on the boy's phone confirmed the boy's statements. On the day the boy sent I.J.S. pictures of his penis, the following text conversation took place between the boy and Mother:

| BOY: | I showed her my dick, so when can I see them titties? |
|---|---|
| MOTHER: | Talk to her. |
| BOY: | Okay. Can you also talk to her? |
| MOTHER: | Yeah, when she comes out of the shower. |
| BOY: | Okay. I'm talking a shower. I want to see her tito's [sic]. I love her ass. She be teasing [sic] me though. |
| MOTHER: | Enjoy your shower. Yeah, I agree. |
| BOY: | About me seeing her titties? |
| MOTHER: | I agree with you. I will tell her. |

This conversation between Mother and the boy occurred on March 27, 2022:

| MOTHER: | But you have to try and touch her, too. |
|---|---|
| BOY: | Okay. |
| MOTHER: | She said you started to and then you stopped. |
| BOY: | Touch her? Like where? |
| MOTHER: | Vagina. |
| BOY: | I'm scared. What if she gets uncomfortable? |
| MOTHER: | She will tell you. |
| BOY: | Okay. |
| MOTHER: | I told her she would never know if she likes it unless she tries. She said okay. |

The next day, the following exchange between Mother and the boy occurred:

| MOTHER: | Did your penis go inside [I.J.S.]? |
|---|---|
| BOY: | Maybe. We tried. |
| MOTHER: | Did you really? |
| BOY: | We didn't know how to do it. |
| MOTHER: | LOL. You'll figure it out. |
| BOY: | Okay. |
| MOTHER: | Try again. |
| BOY: | When? Today? |
| MOTHER: | Whenever you want. |

The boy's phone also showed regular FaceTime videos and calls between the boy and Mother. According to the proffer, Mother initially denied involvement in the boy's and I.J.S.'s relationship, claiming she never brought the boy on base and I.J.S. was the one who was using Mother's phone to text with the boy. However, her story slowly changed and she admitted to sending many of the messages, including the exchanges where she agreed to talk to I.J.S. about sending photos of her breasts to the boy, and the exchange where Mother told the boy to touch I.J.S. on her vagina and to try again to have sex. Agents took custody of Mother's phone and found TikTok messages between Mother and the boy on April 4, 2022, which was after the boy's phone had been turned into authorities. In these messages, Mother attempted to coach the boy, telling him that he was never in her car and that he had always met I.J.S. at the park and that there was "nothing wrong with doing that." In a Snapchat conversation, Mother asked the boy what he was going to tell authorities, and he replied that Mother should have told the truth. The next day, Father attempted to retrieve the boy's phone from base authorities.

When asked about these allegations at trial, Mother invoked her right under the Fifth Amendment not to incriminate herself.[2] Mother testified that as a result of the criminal allegations, she has been incarcerated for eighteen months at a federal holdover facility awaiting trial. She testified that I.J.S. was twelve years old when this case started and was fourteen years old at the time of trial. Mother characterized I.J.S. as an honest child, stating that she trusted I.J.S. to be truthful. When asked whether I.J.S. would be telling the truth if she told others Mother had told her to have sex with a boy or to have a boy touch her vagina or breasts, Mother invoked her right

---

[2]The trial court, as factfinder, was free to draw a negative inference from her invocation of the Fifth Amendment to these questions. *See* TEX. R. EVID. EVID. 513(c); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007) (per curiam); *In re A.R.P.*, No. 04-23-00668-CV, 2024 WL 251957, at *2 (Tex. App.—San Antonio Jan. 24, 2024, no pet.); *In re I.N.D.*, No. 04-20-00121-CV, 2020 WL 2441375, at *6 (Tex. App.—San Antonio May 14, 2020, pet. denied).

under the Fifth Amendment not to incriminate herself. When asked whether Father was aware she had provided a cell phone to the boy in question, Mother invoked her Fifth Amendment right. When asked whether Father knew there was evidence relating to Mother encouraging the boy to have sex with I.J.S. on the phone Mother had given the boy, Mother invoked her right under the Fifth Amendment. When asked whether Father knew there was evidence on the phone she had given the boy when he went to pick up the phone from law enforcement, Mother at first invoked her Fifth Amendment right, but then decided to answer the question. She testified that Father "did not know anything." When asked what evidence was on the phone she had given the boy, Mother again invoked her right under the Fifth Amendment. She continued to invoke her right not to incriminate herself under the Fifth Amendment to questions about whether there was evidence of her texting the boy telling him to touch I.J.S.'s vagina, to touch I.J.S.'s breast, and to try to have sex again with I.J.S.

Mother testified that Father was an involved parent and that they shared responsibilities in the home. Mother admitted to keeping secrets from Father. When asked whether one of the secrets she kept from him was that she was prompting the boy to have sex with I.J.S., Mother again invoked her Fifth Amendment right. Mother testified she heard the proffer at the federal hearing but that she did not make any of those admissions. When asked if there was evidence on the phone in question that was "supportive of . . . those alleged admissions that [she said] she didn't make," Mother again invoked her Fifth Amendment right.

At trial, Father testified that he was present at the federal hearing in question and had heard the proffer detailing the allegations against Mother. He testified that he understood Mother was accused of providing "communication devices to [another] child for purposes of instigating a sexual encounter between" I.J.S. and the other child. He testified he was aware his wife had been charged with attempted production of child pornography, attempted coercion and enticement of a

child, and obstruction of justice. Although Father admitted to being present at the federal hearing, he said he did not remember hearing his wife's admissions of the allegations against her. He testified he remembered the prosecutor merely talking about the allegations. When asked if he believed the allegations against his wife, he testified that he believed "portions of it," but not "the entirety of it." He was asked if he believed that his wife attempted to produce child pornography. He replied, "No." He was then asked whether he believed Mother attempted to coerce or entice a child. Father again replied, "No." Father was then asked whether he believed Mother encouraged a boy to have sex with I.J.S. or encouraged I.J.S. to send photos of her breasts to the boy. Father replied, "No." Father was asked whether he believed Mother encouraged a boy to touch I.J.S.'s vagina. He replied, "No." Father was next asked whether he believed Mother told the boy to masturbate. He answered, "No." Father was then asked, "So you don't believe any of this?" Father replied, "That is incorrect."

Father was asked whether he was aware Mother had provided the boy with the phone in question. Father replied that he was not aware Mother had provided the phone and was "under the impression that [his] daughter had provided it." Father was then asked, "Regardless, after being made aware, you went and attempted to collect that phone from the authorities, correct?" Father replied, "Correct."

Father admitted that at numerous hearings, he had heard the Department voice concerns about him regarding his "protective capacities as it relates to [his] children from [his] wife." Father agreed that he had been told to create a safety plan to protect his children from his wife. However, when asked if his children needed protection from his wife, Father replied, "I do not believe so." Father stated he believed "there's a need to address what led up to the allegations." Father emphasized that Mother was "facing allegations," but had "not been convicted of them yet." Father testified, "My plan is to–as per–what was in my protective measures plan submitted to the

counselor and to CPS is as long as there are allegations [pending] against my wife, I will do whatever I need to protect them from any further harm." Father was then asked whether he believed I.J.S. had been harmed. He answered, "I believe—again, I believe that certain things have been within what was said during the [federal] hearing based off what I know." Father was again asked whether he believed I.J.S. had been harmed. He replied, "I believe there was harm to a certain–I believe there was harm to a certain degree." Father was then asked whether he believed "any of the allegations levied against [his] wife [were] true." Father answered, "Correct. As I understand it . . . I do not believe them." Father testified, "I believe that [I.J.S.] and the other child attempted to have sex because [I.J.S.] admitted it to me. As far as the lead-up to it, as far as some of the preceding things such as the sleep-over, there are inaccuracies there."

Father was then asked why he attempted to retrieve from law enforcement the phone Mother had allegedly given the boy to communicate with her and I.J.S. Father replied, "Because it was–it was our property." Father testified he had not intended to hide evidence.

Father testified he communicated with his wife daily. He stated that he would not allow the children to have contact with his wife until her criminal charges were resolved. According to Father, he would believe the allegations if his wife admitted to them. Father was given State's Exhibit 1, the transcript of the federal hearing, and asked to read the pages detailing the allegations against his wife in the proffer, which had been read into the record. Father was again asked whether he believed the allegations against his wife. He replied, "I have a hard time believing it."

Father testified his wife and I.J.S. had a relationship that was "half mother/daughter" and "half friend/friend." He testified that his wife and he planned to stay together if she was found not guilty of the charges.

Debra Pina, the Department's caseworker, testified that Father was in counseling but was not fully accepting responsibility and his safety plan was not realistic. She testified about concerns

the Department had about his failure to be protective of his children, specifically his disbelief in what I.J.S. has reported and his inability to believe the accusations against his wife. Pina testified that during the pendency of this case, she explained to Father that in addition to completing the services in his family service plan, he also had to change certain behaviors and demonstrate what he learned from the classes and therapy. Pina expressed concerns about Father's parenting abilities. Pina gave an example where it had been discovered I.J.S. was stealing from one of her caregivers for an extended period of time. Pina testified that Father merely told I.J.S. that if she was stealing to stop, and if she was not stealing, to not start. Pina characterized Father as being "very emotionless" and "not really going into depth." Pina testified she would have liked to have seen a more in-depth conversation with I.J.S. exploring why she had been stealing and having a dialogue about the situation. Pina testified this incident was similar to when I.J.S. had been caught vaping. When Pina brought the matter to Father's attention, he just told I.J.S., "You need to stop vaping. That's not good for you." Pina testified that she waited for him "to follow up with any type of other response or directive." Pina testified that she had to then prompt Father to ask where I.J.S. had gotten the vape and why she was vaping. According to Pina, "it was not intuitive of him as a parent to be able to say like, 'Okay. What's going on?'" Pina testified that during their visits, I.J.S. and Father "would just sit down, [and] he would bring food and just talk; but it was just talk[ing] about . . . kind of what he does, like his job, and he was just started to talk about being—I'm not sure if that's the correct – a linguist, but things like that." "It wasn't really about [I.J.S.], like asking her how she was doing." Pina described the conservations as just him talking.

Victoria Caylor, a licensed professional counselor and licensed sex offender treatment provider, testified she had been Father's therapist since August 25, 2022. She was providing him treatment for "[a]nxiety issues, personality issues, parenting issues, [and] poor decision making." She testified Father had anxiety about this underlying action and about his wife's criminal case.

Caylor characterized his personality issues as one of "denial"—"the denial that his spouse committed any of these offenses." She explained that his poor decision making was a result of him not "really know[ing] what was going on in his home." She testified that Father "didn't know about the electronic devices. He didn't know anything that apparently [Mother] was doing or not doing until it came to light during the investigation." When asked what responsibility he was taking for his children, Caylor testified that he "visits them," "brings them gifts," "talks to them on the phone."

Caylor was asked whether Father took "responsibility for the sexual abuse that occurred to his daughter." Caylor replied, "No, sir." Caylor testified that Father "acknowledge[d] something happened, but he said that [Mother] was misguided." According to Caylor, Father said "it was a misguided attempt to teach [I.J.S.] about sex." Caylor was asked whether Father said the allegations of Mother telling the boy to have sex with I.J.S. was merely "misguided," Caylor testified Father said that "the boy was lying." Caylor testified that Father had made some progress in therapy but had "been at a plateau for a long time." According to Caylor, Father "believes that his spouse is going to be exonerated . . . from all charges, and at that point she will be able to come home and live with him." Caylor testified that the underlying case and Mother's criminal case had been pending for over a year and Father "still believes that she will be exonerated." According to Caylor, "at some point you would think that some of this—this information coming through to him would begin to take hold." Caylor testified she would like to see some action on Father's part to protect his children. Caylor was asked whether she ever discussed with Father what would happen if Mother was convicted. Caylor replied, "Yes, ma'am. However, [Father] did not want to hear of it." Caylor testified that Father speaking daily to Mother told her that he "is very, very focused on [Mother]."

Like the Department's caseworker Pina, Caylor testified that Father "has a problem disciplining his children." Caylor testified that Father can utter the words disciplining the children but does not "follow through with actions." Caylor described the incident with I.J.S. vaping and stealing from her caretaker. Caylor testified all Father told I.J.S. was not to "do that" again.

On redirect examination, Father testified that he did not have "direct knowledge" that Mother had encouraged a boy to have sex with I.J.S. When asked about the specific allegations against Mother, he reiterated that he had "no direct knowledge" of the allegations. He was asked whether he *believed* the specific allegations that Mother encouraged a boy to have sex with I.J.S., encouraged a boy to touch his daughter's vagina, encouraged his daughter to send pictures of her breasts to a boy. Father was adamant that he did not believe those allegations.

Megan McPheron, a licensed professional counselor, has been I.J.S.'s therapist since April 2022. She testified that I.J.S. has been improving and is happier than she was when she came into the Department's care. I.J.S. was angry about the "whole case" and "the whole situation." McPheron testified that I.J.S. understood she and her brother were removed from their parent's care because Mother "encouraged" her to take topless pictures of herself and send to a boy and "encouraged" her to have sex with the boy. According to McPheron, I.J.S. confirmed the accusations against her Mother and said her Mother "encouraged her to take a [topless] picture and send it to the boy and she did it." "She sent the picture." I.J.S. also told McPheron that Mother "encouraged her to have sex, and she didn't want to."

McPheron testified that at the beginning of this case, I.J.S. always wanted to return home. According to McPheron, over a year later at the time of trial, I.J.S. was fine staying with her foster parents, who wished to adopt her. McPheron testified that she believed I.J.S. to be "a truthful person." According to McPheron, I.J.S. is aware Father does not believe that what she said happened did happen. I.J.S. "wishes that her dad believed it—that it happened." McPheron was

asked her opinion of I.J.S. returning home when her Father does not believe what I.J.S. said happened. McPheron testified, "I think that would be hard because she's worked really hard to talk about and to heal from her experience." "It would take some treatment and discussion for that – of those things for [I.J.S.]." McPheron testified it would not be healthy for I.J.S., a victim of sexual abuse, to be in a home where her caregiver believes her to be a liar.

### STANDARD OF REVIEW

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id*.

### SUBSECTION (E)

On appeal, Father argues the evidence is legally and factually insufficient to support termination of his parental rights on subsection (E) grounds. Subsection (E) allows termination of parental rights if the trial court finds by clear and convincing evidence that the parent "engaged in

conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Under subsection (E), the trial court must determine "whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being." *In re C.J.G.*, No. 04-19-00237-CV, 2019 WL 5580253, at *2 (Tex. App.—San Antonio Oct. 30, 2019, no pet.). "[E]ndanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional or mental health." *Id*. at *3.

Termination under subsection E "may not rest on a single act or omission; it must be 'a voluntary, deliberate, and conscious course of conduct.'" *Id*. (quoting *Jordan v. Dossey*, 325 S.W.3d 700, 723 (Tex. App.—Houston [1st Dist.] 2010, pet. denied)). While "[a]n endangerment finding often involves physical endangerment," "the statute does not require that the parent's conduct be directed at the child or that the child suffer actual injury." *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied) (mem. op.). "[R]ather, it is sufficient if the conduct endangers the child's emotional well-being." *K.M. v. Tex. Dep't of Family & Protective Servs.*, 388 S.W.3d 396, 403 (Tex. App.—El Paso 2012, no pet.). "Endangerment of a child's well-being may be inferred from parental misconduct, including conduct that subjects the child to a life of uncertainty and instability." *Id*. "The parent-child relationship, and efforts to improve or enhance parenting skills, are relevant in determining whether a parent's conduct results in endangerment under subsection (E)." *Id*. For purposes of subsection (E), "courts may consider conduct *both before and after* the Department removed the child from the home." *In re C.J.G.*, 2019 WL 5580253, at *3 (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)) (emphasis added).

In support of his argument that the evidence is legally and factually insufficient to support the trial court's subsection (E) finding, Father emphasizes in his brief that this "case began because

[Mother] was encouraging sexual activities between I.J.S. and another child" and that he "was uncertain about what was happening" until after the children were removed. According to Father, at the time Mother was engaging in the conduct, "he was either working or in military school during those times." Father, however, fails to acknowledge his actions since the children's removal.

Courts have found legally and factually sufficient evidence to support termination of parental rights under subsection (E) when there is evidence the parent did not believe the child's accusations of abuse and would not be protective of the child. *See, e.g.*, *In re A.P.*, No. 10-22-00328-CV, 2023 WL 2308270, at *2 (Tex. App.—Waco Mar. 1, 2023, no pet.) (explaining that evidence mother disbelieved her daughter's allegation of sexual abuse by mother's boyfriend and failed to be protective of her daughter by not ending relationship with boyfriend was sufficient to support a finding under subsection (E)); *In re C.M.*, No. 10-13-00080-CV, 2013 WL 4702794, at *2-3 (Tex. App.—Waco 2013, no pet.) (holding that a mother's disbelief in her child's allegations of sexual abuse against the stepfather and the mother's continued contact with the stepfather constituted endangering conduct under subsection (E)); *K.M.*, 388 S.W.3d at 403 (holding evidence was legally and factually sufficient to support the trial court's finding under subsection (E) when there was evidence mother was hostile during the investigation into allegations made by her daughter against her husband, expressed disbelief that the sexual abuse occurred, and sought leniency for her husband in his criminal case).

Here, there was evidence that when the investigation began into Mother's conduct in April 2022, Father was not cooperative with investigators, would not allow his children to be interviewed, and attempted to retrieve from law enforcement the cell phone Mother had given the boy so that the boy could communicate with her and I.J.S. There was also evidence that at the September 30, 2022 federal hearing, Father heard a proffer read into the record that detailed the

allegations and evidence against Mother. The proffer also detailed Mother admitting to federal investigators that she committed some of the allegations against her. Nevertheless, a year later at the time of trial, Father was still adamant during his testimony that he did not believe the allegations against Mother. He testified that he still communicated with Mother daily and that he planned on continuing his relationship with Mother if she was not found guilty in her criminal case. He promised only to not allow the children to have contact with Mother until her criminal charges were resolved. Both the caseworker and Father's therapist testified about concerns that he would be protective of his children. The caseworker testified Father had expressed he did not believe what I.J.S. reported. His therapist talked about Father being in denial that Mother had committed any of the alleged offenses. They both discussed concerns with his parenting abilities. His therapist testified that Father had failed to take responsibility for the sexual abuse that I.J.S. had suffered, acknowledged only that "something happened," but believed that Mother's actions were "a misguided attempt to teach [I.J.S.] about sex." When asked about other allegations involving the boy in question, Father stated that "the boy was lying." On redirect examination, when asked specifically about whether he believed Mother encouraged a boy to have sex with I.J.S., encouraged a boy to touch I.J.S.'s vagina, encouraged I.J.S. to send pictures of her breasts to a boy, Father was very clear that, even a year and a half after removal of his children, he did not believe those allegations against Mother.

Additionally, Father's therapist testified that Father had "been at a plateau for a long time" and that after the amount of time that had passed, she would have liked to see some action on Father's part to protect his children. The therapist testified that Father still believed that Mother would be exonerated and that he did not want to discuss what would happen if Mother was convicted. His therapist also testified that Father speaking daily to Mother indicated to the therapist that Father was "very, very focused on [Mother]." Further, I.J.S.'s therapist testified that I.J.S.

knew Father did not believe her and wished he did believe her. I.J.S.'s therapist testified that it would be detrimental to I.J.S.'s well-being for her, a victim of sexual abuse, to return to a caregiver who believed her to be a liar.

After reviewing all the evidence in the light most favorable to the trial court's subsection (E) finding, we conclude that the trial court, as a reasonable trier of fact, could have formed a firm belief or conviction that its finding that Father engaged in conduct which endangers I.J.S.'s physical or emotional well-being was true and thus was legally sufficient. *See In re A.P.*, 2023 WL 2308270, at *2; *In re C.M.*, 2013 WL 4702794, at *2-3; *K.M.*, 388 S.W.3d at 403. With regard to factual sufficiency, although Father emphasizes that he had no knowledge of Mother's conduct before the children were removed, for purposes of subsection (E), we consider conduct *both before and after* removal. *In re C.J.G.*, 2019 WL 5580253, at *2. In looking at evidence both before and after removal, we conclude that the disputed evidence that a reasonable factfinder could not have credited in favor of the trial court's finding is not so significant that a factfinder could not have reasonably formed a firm belief or conviction that subsection (E) finding was true. *See In re A.P.*, 2023 WL 2308270, at *2; *In re C.M.*, 2013 WL 4702794, at *2-3; *K.M.*, 388 S.W.3d at 403. Therefore, we hold the evidence is also factually sufficient to support the trial court's finding under subsection (E).[3]

## BEST INTEREST

Both Mother and Father argue the evidence is legally and factually insufficient to support the trial court's findings that termination of their parental rights was in their children's best interest.

---

[3]Having determined there is legally and factually sufficient evidence to support the trial court's finding under subsection (E), we need not consider Father's argument that there was legally and factually insufficient evidence to support the trial court's finding under subsection (O). *See In re D.J.H.*, 381 S.W.3d 606, 611-12 (Tex. App.—San Antonio 2012, no pet.) (explaining that when the trial court terminates the parent-child relationship on multiple grounds under section 161.001(1), we may affirm on any one ground because, in addition to finding that termination is in the child's best interest, only one predicate violation under section 161.001(1) is necessary to support a termination decree).

*See* TEX. FAM. CODE § 161.001(b)(2); *In re J.O.A.*, 283 S.W.3d at 344 (explaining legal and factual sufficiency standard). There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, the trial court should consider the relevant factors set out in section 263.307. *See* TEX. FAM. CODE § 263.307(b).[4] In addition to these statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 372 (Tex. 1976).[5] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *see In re E.A.R.*, 672 S.W.3d 716, 722 (Tex. App.—San Antonio 2023, pet. denied) (noting that a best-interest finding does not require proof of any particular factor). "Evidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest."

---

[4]These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[5]These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).

*In re E.A.R.*, 672 S.W.3d at 722 (quoting *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied)). Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may also judge a parent's future conduct by her past conduct. *Id.*; *In re E.D.*, 419 S.W.3d 615, 620 (Tex. App.—San Antonio 2013, pet. denied). The predicate grounds for termination may also be probative of best interest. *In re C.H.*, 89 S.W.3d at 28; *In re E.A.R.*, 672 S.W.3d at 722.

In support of her argument that the evidence is legally and factually insufficient to support the trial court's finding that termination of her parental rights is in the best interest of her children, Mother points to evidence that she has "done what she can during this litigation given the restraints placed on her by incarceration and the lack of programs at her disposal to address the service plan." She further agues that at the time of removal, she was living in a stable home with Father "and should she be released from incarceration she should be able to re-establish that stability." Mother, however, does not discuss the evidence of the criminal allegations against her. She does not mention that she took the Fifth Amendment when asked specific questions about the criminal allegations. The trial court, as fact finder, was free to draw a negative inference from her invocation of the Fifth Amendment to these questions. *See* TEX. R. EVID. 513(c); *see also Baxter v. Palmigiano*, 425 U.S. 308, 318 (1976); *Wilz v. Flournoy*, 228 S.W.3d 674, 677 (Tex. 2007) (per curiam); *In re A.R.P.*, No. 04-23-00668-CV, 2024 WL 251957, at *2 (Tex. App.—San Antonio Jan. 24, 2024, no pet.). Thus, the trial court could reasonably infer that Mother did sexually abuse I.J.S. and another boy. The trial court could also judge her future conduct by her past conduct and conclude Mother would endanger I.J.S. again in the future. *See In re E.A.R.*, 672 S.W.3d at 722; *In re E.D.*, 419 S.W.3d at 620. Additionally, the trial court could reasonably infer that as a result of her criminal conduct, Mother would not be able to provide her children with a stable home

environment. We conclude the evidence is legally and factually sufficient to support the trial court's best-interest finding.

With regard to Father, he points to evidence that he completed parenting classes and a psychological evaluation, engaged in counseling, maintained stable employment, has stable housing, and has avoided all criminal activity. He visited his children regularly during the pendency of this case, and he has a stable home and employment. He argues in his brief that the "only service the Department is concerned with are notes and feedback from [his] individual counselor, stating that [he] has not fully accepted responsibility, his safety plan was not realistic, and concerns regarding his parenting and disbelief in I.J.S.'s statements."

"Compliance with a family service plan does not render termination impossible or trump all other termination factors." *In re A.F.*, No. 14-17-00394-CV, 2017 WL 4697836, at *10 (Tex. App.—Houston [14th Dist.] 2017, no pet.). "The elements of a safe, stable, and happy childhood cannot all be reduced to a checklist in a service plan." *In re M.G.D.*, 108 S.W.3d 508, 514 (Tex. App.—Houston [14th Dist.] 2003, pet. denied). As Father acknowledges, the caseworker, Father's therapist, and I.J.S.'s therapist all pointed to concerns they had with Father's inability to acknowledge Mother's criminal conduct and be protective of his children. There was evidence of Father's continuing fixation on Mother, his disbelief in I.J.S.'s statements about what Mother did to her and the other boy, and his inability to support I.J.S. as a sexual abuse victim. Both the caseworker and his therapist expressed concerns about his parenting abilities, noting that he had issues with disciplining and communicating with his children. His therapist testified Father's poor decision making was shown by him not "really know[ing] what was going on in his home." His therapist also discussed one of his personality issues, which she characterized as "denial" in not acknowledging his spouse committed any of the offenses. She expressed that at the time of trial, Father should have been progressing but had instead remained on a plateau for a long time.

With regard to the children's desires, there was evidence that at the beginning of the case, I.J.S. wanted to return home. I.J.S.'s therapist testified that a child may wish to return to their parents even after abuse and neglect and even if returning to her parents is not in her best interest. According to I.J.S.'s therapist, after almost a year and half of waiting for this case to conclude, I.J.S. was "not thinking about the case as much" and was "okay with calling [her foster] parents mom and dad." Both I.J.S.'s therapist and the caseworker testified that at the time of trial I.J.S. was "okay" with staying with her foster family, who wanted to adopt her. The caseworker testified I.J.S. had improved in foster care and was happier than she had been at the beginning of this case. I.J.S.'s therapist also discussed how difficult psychologically it would be for I.J.S., as a sexual abuse victim, to return to the care of someone who did not believe her. The caseworker testified that B.K.S. was also "doing really well." He was placed with his maternal uncle and aunt, who also wanted to adopt him. Both placements will ensure that the children maintain contact with each other.

In viewing all the evidence in the light most favorable to the trial court's finding, the trial court, as factfinder, could have reasonably determined that Father would not be protective of his children and that the children would be in emotional and physical danger if they were returned to Father. *See In re S.R.M.*, No. 04-21-00168-CV, 2021 WL 4875538, at *5 (Tex. App.—San Antonio Oct. 13, 2021, no pet.) (explaining that parent's inclination not to believe the sexual abuse allegations demonstrates a pattern of endangerment to the emotional well-being of her children). Thus, we hold the evidence is legally sufficient to support the trial court's best-interest finding. *See id*. at *7.

With regard to factual sufficiency, even though there was testimony that Father completed many services, had stable employment and housing, and visited his children during the pendency of this case, the trial court could have reasonably found that termination of his parental rights was

in his children's best interest by relying on evidence that Father lacked sufficient protective capacity of his children, lacked the ability to sufficiently support I.J.S. as a sexual abuse victim, and failed to improve the parenting concerns expressed by the Department during the pendency of this case. *See id*. at *5-7 (holding evidence was factually sufficient to support finding was in the best interest of all the children where there was evidence of parent's failure to believe one of the children's sexual abuse allegations against spouse, which allowed trial court to conclude parent would fail to be protective of children). Accordingly, we cannot conclude that in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the best-interest finding is so significant that a factfinder could not have reasonably formed a firm belief or conviction that termination was in the best interest of the children. *See In re J.O.A.*, 283 S.W.3d at 344 (factual sufficiency standard). Thus, we hold the evidence is also factually sufficient to support the trial court's finding that termination of Father's parental rights is in the best interest of the children.

### CONSERVATORSHIP

Finally, Father argues that because the trial court's order of termination should be reversed, the trial court's order should also be reconsidered. However, we have found no ground upon which the trial court's order of termination should be reversed. Thus, we need not consider this issue.

### CONCLUSION

For the reasons stated above, the trial court's order terminating Mother's and Father's parental rights is AFFIRMED.

Liza A. Rodriguez, Justice